at AL. Mr. Beacon for the announcement, Mr. Buellen for the emcee. Mr. Beacon for the announcement, Mr. Buellen for the emcee. Good morning, your honors. May it please the court, my name is Tim Beacon. I'm here for the appellant North American Butterfly Association. I'm going to refer to them as NABA in the course of my argument. The case involves Border Patrol effectively seizing control over two-thirds of NABA's 100-acre National Butterfly Center and excluding NABA from it. The issues that are presented include whether the district court erred in dismissing our Fourth Amendment seizure claim for failure to state a claim by relying on open field search doctrine and the Border Patrol's patrol authority. Whether the district court erred in dismissing the due process claim as an unrighteous compensation claim. Whether the 2019 Appropriations Act nullified the Secretary of Homeland Security's IRIRA waiver of NABA's claims under NEPA and the ESA. And whether the Secretary's IRIRA waiver is ultra-violent, given that the Secretary did not comply with the IRIRA consultation requirement before issuing the waiver. But first I want to address the court's jurisdiction. The district court's order should be viewed as final, notwithstanding that it granted leave to amend, because NABA could not re-plead these claims on the facts consistent with the district court's ruling. The general approach is that if the district court dismisses the case, it's final, and if it dismisses the complaint without prejudice or with leave to re-plead, it's not final. But this court has noted exceptions to that rule in the Surowski case, Surowski v. CIA, 355 F. 3rd, 661. And one of those exceptions is applicable here. That's when it's clear from the ground, cited by the district court dismissal, that there was no amendment that could cure the defects. Where was that clear in this order? Well, Your Honor, the district court held on page 8 of its memorandum opinion, that's page 715 of the appendix, and I'm quoting, that were not in your complaint about the nature of Border Patrol activity on your land that might conceivably have altered the analysis. Didn't you? We do have a lot of facts in the declarations that we submitted. But they're not in the complaint. There are also facts in the complaint. The two-thirds of property excluded was not in the complaint. Actually, Your Honor, I think that it is in the complaint. We're talking about the deprivation of... I'm sorry. I believe that the complaint is... Well, that's for the border wall, not for the patrolling activities. Right. You have talks about locking gates and things like that, and the border wall has been addressed through subsequent legislation. But I thought your declarations talked about the way they were locking gates was also going to... Well, I think we talked about... Well, we have an unfolding situation, Your Honor, so that when we first brought suit at the end of 2017, circumstances changed, evolved, and deteriorated after that point in time. So I think... I mean, I think it's a question for the court. We submit these declarations which were in support of the court's jurisdiction because the government challenged jurisdiction on three of our claims. So the court has that. I think it... Is the court supposed to ignore that when it's deciding the 12B6? Apparently they are. We have a case that says they're supposed to ignore the 12B6. So that's something that could have been addressed in an amendment, is put all these evolving facts in, and the nature of either the ripeness of the taking or the nature of the intrusion for purposes of the Fourth Amendment, if you're outside the taking context, wouldn't have been... I'm sorry, Your Honor, suggesting that we could have amended? I'm asking you the question. You have a lot of facts, and if you think you've taken all of those facts from the declaration and included them in the complaint, and anything else that's happened in the meantime, would it have allowed you to have additional Fourth Amendment arguments that would answer just the open fields argument? Well, the problem, Your Honor, is that the district court dismissed the Fourth Amendment claim as a search claim, and we pleaded a seizure claim. The district court... I mean, sorry, the Supreme Court in the Soldall case made it clear that these are two completely different worlds, that search implicates privacy interests, seizure implicates possessive interests. But doesn't Soldall also refer... Forgive me if my memory doesn't serve, but doesn't it also, in a footnote, refer to Oliver and talk about the sexual limitations of the Fourth Amendment to homes and sex and not including non-residential real estate? It does, Your Honor, but that's actually... It's different in that case, and what I would say is if the court looks at the Supreme Court's decision in Donovan v. Dewey, which we also cited in our brief, there, what you have is a government agency... Before we go on to other cases, Judge Pillow brought up Soldall. It says the Fourth Amendment does not protect possessory interests in all kinds of property, and it gives the example of an open field. Your Honor... All right, well, Your Honor, I think whether the Butterfly Center is an open field is a question of fact. I mean, we have 100 acres. It's a botanical garden. I think that reasonable inferences suggest that by a botanical garden there are going to be structures and equipment on the botanical garden for its use and maintenance, and that's in the complaint, and so... It's not your Fourth Amendment claim. Fourth Amendment claims about occupation and deprivation. The question here is you're the one who said your theory for jurisdiction is that there's nothing you could do to amend it to change the nature of the Fourth Amendment claim, but your Fourth Amendment claim is permanent intrusion and occupation deprivation. You don't have any argument about impact on, any argument on effects, botanical garden. You're right, Your Honor. Well, I mean, our position is that the deprivation of novice interests, property interests in the Butterfly Center, and, I mean, the Butterfly Center is both an operation, that's sort of a business operation, as well as it's the land that it sits on. So I have a question. I mean, it's a tricky issue about the seizure of property, and I understand that you've appealed because you thought that the application of the open field aspect of Fourth Amendment doctrine was error because that really, as most developed, goes to the search aspect of the Fourth Amendment rather than the seizure aspect. But I wonder, is that an issue we need to resolve here because aren't the same interests that you would seek to protect through your Fourth Amendment claim also protected through your Fifth Amendment claim? Just hypothetically, were we to recognize you adequately pleaded a Fifth Amendment claim but not a Fourth Amendment claim, what would you lose in terms of the practical relief that you're seeking? Well, I mean, I think that that's something that we would like to have developed in the trial court, the difference between those things. But, I mean, at the end of the day, if we were to prevail on a due process claim and not on the Fourth Amendment claim, I think our client would... What exactly is your due process claim? Our due process claim is that they came and occupied the property in such a way that it satisfies the Elkins standard for deliberately flouting the law because they don't have authority to be there to do that thing. And it has a significant impact. You know, it trammels our property interest. It has a significant constraint on our significant property interest. And the property interests we're talking about are the right to exclude people from the property and also the right to use enjoyment of the property. Did you argue that your complaint... I read your complaint as arguing that they exceeded their authority. I mean, your briefs talk about it, but you didn't raise a claim that they violated or went beyond their authority under 8 U.S.C. 1357. Are you just going to bake that into the Fifth Amendment claim and the Fourth Amendment claims? Because the other thing here is you would agree, your client agrees that they have the ability to enter for patrolling purposes under the statute. You don't contest that. You say you've always cooperated with that. So that seems to me that's sort of a limitation on traditional property rights that they wouldn't have in my backyard. And so it's going to be sort of a complicated question of showing when the intrusion went beyond what the statute would allow, what qualification on your property rights the statute imposes. And so it's going to have to be that extra, right? What qualifies as patrolling before we get to a Fourth or Fifth Amendment question, aren't we? I don't think patrolling affects the property rights. Patrolling affects the privacy. It doesn't affect exclusion. I mean, the right to exclude. That's a pretty traditional property right. Okay. To that extent. To that extent. As to what... I know there's a debate about whether all of this was legitimate patrolling, but it certainly eliminates some of your trespass rights. Fair enough, Your Honor. But we're not claiming any violation based on their legitimate patrolling. What is the scope... I mean, so it seems like you and the government are to some extent talking past each other on the scope of the patrolling prerogative. You know, to you it seems clear that what they're doing is a lot of activity that isn't patrolling. And I take it that you're viewing patrolling as CBP officers walking back and forth. And I think they're viewing patrolling to include rights of way, censors, lights, and people walking back and forth. Is that... Can you help clarify what your position is on where patrolling leaves off and unauthorized property intrusion picks up? Patrolling leaves off when the purpose of the government's presence is not to... for the prevention of an illegal border crossing. It's not... It leaves off where they're engaging in activities that are not customary or reasonable and necessary in the language of their own... But their own regulation which defines patrolling says what's customary or reasonable and necessary. And I would say that's something... Again, another thing we'd like to develop in the trial court because building a wall is not customary or reasonably necessary... reasonable and necessary. As far as I know, it's Hadrian's Wall and the Great Wall of China are the only times this has been tried. So... Well, if the wall means barriers, different types of barriers... I'm sorry? Wall means different types of barriers. Yes. That is a pretty common tool that the Border Patrol uses to police the border, to patrol the border. And so the question is whether what's customary and necessary for purposes of this provision as to private property is narrower than, say, what they would do at the actual border crossing themselves. Well, Your Honor, at the border crossing itself, it's not... I'm not aware of any instance where the government... And I don't think there's anything in the record about the government using barriers on private property. They use barriers on a public road. They haven't built a barrier and you are claiming a ripe Fifth Amendment claim. Can you more concretely identify for us what activities the government has undertaken that you believe are not concomitant to patrolling? Yes. Their statement to Nava's staff and guests that they're excluded from the 70 acres of the property, over two-thirds of the property. And then the complaint or the declaration? It's in both. That complaint just talked about showing that they were going to do a wall and it would go through and cut off two-thirds. And I thought the declarations was where we got the using locked gates and stuff to keep people from going. Am I wrong? That's a different thing, right? Because the wall through falls away with the Appropriations Act limitation, but then with the declarations, that is fine. But now what they're doing is locking gates and preventing our access. That's not in the complaint. We're having all this conversation because you said there's nothing you can do to amend your complaint. Paragraph 60 of the complaint has the local border patrol chief telling Nava that it can't lock its gates and that if it does, they're going to cut the locks. But that doesn't have the two-thirds. I beg your pardon? That doesn't make the two-thirds point you were just doing. Maybe if they mean you're locking the gates to keep the border patrol people out, you can't do that. That might be ordinary border patrol. It might be customary and reasonable. Your Honor, we may not have said two-thirds in the complaint, but we made it clear that they're blocking Nava's staff and guests from substantial portions of the property. So the blocking off from the property, there was some evidence or allegations about replacing your locks with their lock. Yes. What about lights? What about sensors? It would be helpful for me to know whether it's, and I think maybe we're asking two different questions, but for me it would be helpful to know as a factual matter, whether it's in the complaint or in the declarations, what for you is in our property intrusions that are not permitted by the authority to patrol? So one is the exclusion of people from half of the land. Is there anything else? Yes. I'm sorry, before you go to the other, I don't see in your complaint the exclusion by the border patrol officers from two-thirds of the complaint. What it says is, and if I'm just looking at the wrong paragraph, just tell me. You have the border rule thing, but then that's fallen away. And then they say you can't lock your gates. That doesn't mean you can't go somewhere. And then it says there was this campaign of harassment when they temporarily detained a couple people. It could possibly be on JA35 at paragraph 62 about validations of the property. They're interfering, but they're interfering. And also in the claims for relief, we claim there's occupation and deprivation of the property in paragraph 89. You say they're confronting them and they station themselves. I'm not sure how that's different from controlling. And vast stretches are off limits permanently? No, it's intermittent. I mean, sometimes they're there for three weeks and we can't go there, and then they're gone for a week. And then they're back for two days, and then they're gone for another week. So this is permanent. It's not permanent. I mean, it is all taken together. It is having a substantial impact on the Butterfly Center's use and enjoyment of its property. But it's not permanent. I'm sorry. Sorry. So you were asking me about the facts. So they've also invited government contractors and others onto the property without NAVA's permission. So that's the right to exclude others. The Border Patrol has taken it upon themselves to invite these other people on. We have interference with NAVA's operations for no legitimate purpose. Stopping and interrogating staff on a Butterfly Center and public roads nearby, even though they know who they are. Right? So, again, the Border Patrol stops and questions people. But when they know who they are and they're continually stopping and questioning, that's pretextual. They tell visitors that they have told visitors approaching the Butterfly Center that it closed down and they should leave the area. They've even used helicopters to harass guests. Are the helicopters in the complaint? No, they're not. That happens subsequent to the- But you didn't amend your complaint, so- Not for this purpose, right. Do you have more on this subject? I'm just curious about the sensors. Are they legitimate patrolling or not? I thought that he does use sensors in various places. They may. I mean, they certainly have told us that they planted them on the Butterfly Center. And is that legitimate patrolling? I would submit not. I think it's a taking. I mean, it's a taking like putting the cable box on top of an apartment building. Sensors are permanent. Yes. Sensors are permanent. And I just want to know concretely. I mean, even when I ask you for concrete, you talk about exclusion. And I get that there are some concrete allegations about that. Are there other physical things? I mean, I know there are pictures in the record about trucks being parked. There's allegations about lighting. Well, the lighting is part of the proposed project. But I guess actually the short answer is they have not installed lighting. Lighting is not a current problem that we're having. We're concerned about whether they do it because that would have a terrible impact. Clearing of a 150-foot wide- Yeah, yeah. And they said that their instructions were to clear all the way to the river, 1.2 miles, the whole lower two-thirds of the property, which, you know, represented a substantial investment of time. They haven't done that yet. They were stopped. Right. That's not in your complaint that what they were – it says that they tore up a lot of shrubs and stuff, but I didn't hear in your complaint that that was what they tore up was property of the – that it was haptag-cultivated or created with grant money by the center, which would make it – would that make it an effect? Oh, I don't think it makes an effect. But I would say that I think that a reasonable inference- Really? What that makes – doesn't make – But that you're landscaping, it's not an effect for purposes of the Fourth Amendment? Actually, I'm sorry, Your Honor. I would think that is an effect. But that wasn't in your complaint. It's not in our complaint. But what is – what is it? I'm sorry, I don't want you to interrupt me or make it clear. I understand what I'm asking is you do talk – the complaint does talk about widening those roads and tearing up a lot of shrubbery and stuff, but I hadn't seen a Fourth Amendment allegation or facts alleging that in doing that, they were seizing effects and that they were picking up, moving, destroying, controlling, landscaping. Your Honor, the allegations in the complaint say, as the government concedes, that it's a botanical garden. We're entitled to reasonable inferences. It's a reasonable inference that if you have a botanical – You haven't argued effects here. I beg your pardon? You haven't argued interference with effects here. That's correct. You just argued about open field doctrine. I'm sorry. I'm trying to answer the question about whether we have in the complaint that there is landscaping. And I'm saying that it's a reasonable inference that when you have a 100-acre botanical garden, that it's not just, you know, you're calling your back field that you let grow wild your garden, that it's a garden. And it does indicate that there are trails and observation and conservation areas, educational exhibits, a plant nursery. But that doesn't mean those were disrupted by this road. I beg your pardon? There's no allegation that those were disrupted by the road. And so if it's just – sometimes what conservation areas do is just conserve natural habitat. And sometimes they invest in the habitat. And that's what I'm trying to sort out. But we're not talking about a conservation area. We're talking about a botanical garden, as the government concedes. Reasonable inference is that a botanical garden is cultivated. Thank you. A quick fact question. Is the center right on the border, or is it just very close to the border? Right on the border. So that is to say that the south end of the Butterfly Center is the banks of the Rio Grande. Mr. Beacon, I want to change, if it's okay with my colleagues, the subject for just a second and ask you to focus on the effect of the appropriations rider on this litigation. You described the rider as intending to protect the Butterfly Center from new construction, including walls, barriers, roads, enforcement zones, artificial lighting, which I think is right. So am I right that the way I read that, then, is that this moots the appropriation rider, moots your NEPA and Endangered Species Act claims completely? You've got all the relief you could possibly get, right? Well, Your Honor. Which leaves, let me just finish my sentence, which leaves only the constitutional claims. Is that a right way to think about this case? It could be. The uncertainty we have is how the government interprets the rider on the Appropriations Act. We don't know. Is that part of this case? All we have is the language of the Appropriations Act and your statement about what you think it means. If it means what we think it means, yes, Your Honor. Everything is moot except the constitutional questions, right? For now, yes, Your Honor. We don't know what's going to happen with the next Appropriations Act, but that's true. Pardon me? We don't know whether the carve-out for the Butterfly Center will be preserved in the next Appropriations Act. Well, but the next Appropriations Act would not only have to have a carve-out, it has to appropriate money in the next Appropriations Act for wall construction, correct? Yes, Your Honor. So in order for this case not to be moot, it not only has to be a new Appropriations Bill with money, without a carve-out, correct? That's our interpretation. Okay, but just looking at the language of the Appropriations Bill, aren't I correct that everything in this case is moot except your constitutional claims, right? According to our interpretation, yes. I don't understand why they wouldn't be. According to our interpretation, yes. And here's why I'm qualifying that. Pardon me? The reason I'm qualifying that is because we asked the government, when the Appropriations Act was enacted, what their intentions were, because the language of the Appropriations Act rider is not identical to the language  So we weren't sure if they thought, well, we're just not going to build the wall, but we're still going to put in the lighting and the enforcement zone. We've never heard back from them, so that remains an element of uncertainty for us. I don't know what their position is on this. Our position is... They disagreed with that legal interpretation and the case is not moot, correct? Correct. At least until that question is resolved. Yes. And the Appropriations Act says they can't use funds for pedestrian fencing, but the allocation of funds is for both pedestrian fencing and, in a separate paragraph, border security technology. So I assume that's where the action is here. If they were to say that what they are doing is border security technologies and not pedestrian fencing, then it wouldn't fall within the restriction of the Appropriations Act. Is that where all the action is here? Right. That's our concern. Our concern is they're going to say some of what they were going to do, they're not barred from doing. All right. Anything else? Nothing else. Okay. Thank you. Thank you, Your Honor. You're from the agency. Oh, yes. Thank you. Good morning, Your Honors. My name is Jeff Buehler. May it please the Court. I'm here on behalf of the federal appellees. I'm joined at the Council table by Caitlin Straker from the Department of Homeland Security. I just want to touch on, first off, a few sort of factual matters that were raised in the previous argument. Wait, wait. Why don't you tell us first your reaction to whether you think we have jurisdiction because of the fact that there was a...  On the Section 1291 question, there's a minute order issued by the district court on February 14th, 2019, and that order states that the Butterfly Association shall have leave to amend, have leave to file a second amended complaint within 14 days. Right. And what the association did here was not to file an amended complaint, given the opportunity, but it filed a notice of appeal. Do you think they could... And you're satisfied that we have jurisdiction? Yes, Your Honor. And there's also within the district court... So the Saralski case talks about... But you know there's a circuit split on this issue, and this circuit's never expressed its view about this subject. Right. So my reading of the... We did not raise this argument. Our argument on jurisdiction is related to the Illegal Immigration Reform Act. But touching on the 1291 issue, we read Saralski in that it was the dismissal of either a complaint or the entire case. Even Saralski says it's sometimes difficult to tell exactly what the district court is doing. The district court in this case, there's a line in its decision where it says this case is dismissed. I think that in the Saralski case, you had a situation where the district court did not allow... There's no question it was dismissed. The issue here is it was dismissed without prejudice with 14 days leave to amend. Right. And if they wanted to amend their complaint, they had the opportunity to do so, Your Honor. They chose to file a notice of appeal. If the court wants to dismiss under 1291, that works for us. Our argument is that this court actually lacks jurisdiction under the Illegal Immigration Reform and Immigrant Responsibility Act. That's a different argument. Which opposing counsel didn't even address in the roughly half hour that counsel was standing here. So Section 102... Before you, I just want to say on this issue, they say they're in Saralski because there's nothing they could do to amend their complaint to change the outcome given the district court's ruling. Do you agree with that? Your Honor, you've raised instances of allegations that they put in declarations that do not appear in their complaint. Do you agree that that could change the Fourth Amendment analysis? Your Honor, I think we have very strong arguments on the merits of the Fourth Amendment analysis. In this case, it was absolutely correct. Do you agree that botanical gardens or landscaping is in effect? That issue was not raised below, Your Honor. I know it's not raised below. I'm asking you the question of whether the amendment would make any difference. And so part of that would be... I'm not sure it's my job to sit here and speculate as to whether there's merit. Do you have a position on what counts as effects on property? That was never raised below, Your Honor. It's never been raised by the opposing counsel. To my knowledge, the Fourth Amendment... You were making an actual argument about the Fourth Amendment in your brief. I'm making an argument that the Supreme Court has articulated in several cases, Your Honor. No, about open fields, but not about effects. Open fields, there's a case that I cited, open fields are not effects. I believe that's Oliver or Esther. I know, but I'm trying to figure out what's going on. I think personal effects... Excuse me. I'm sorry, Your Honor. Excuse me. If you are mowing down people's landscaping that's part of their botanical garden, it doesn't go enough to say that all happens to be out on a field. You still have to answer the question of the stuff that was bulldozed. The field, it was the botanical plants, rocks, structures. Don't you have to to make that open fields argument, address that question? Let's back up, and this is part of my concern with the factual issues. Nothing has been bulldozed, Your Honor. There's been no enforcement zone created. None of these things have occurred. Wait, I'm sorry. Before we do that, doesn't the complaint allege that there was a widening of a road? That has not occurred yet, Your Honor. There's a levee road. There's a road that goes along the top of the levee. There was a license that was in place, and we cited this in our brief. That license allowed the clearing of shrubbery and some things in order to provide sight lines. The clearing that has occurred has occurred under that license. There has not been an enforcement zone. Doesn't paragraph 53 of the complaint say there was a crew there using chainsaws, using these two cut down trees, mow brush, and widen a private road? The crew had cleared, that sounds like past tense to me, up to 18 feet on each side of the road. Right, and all of that was done under my understanding is the license that was in place that was rejected in 2017. That was not associated with – License under a license rejected? There was a – they denied – we talked about it in our brief, Your Honor. There was a license for the Border Patrol to enter their property and maintain this road. Part of that – License from who? It's between – there's an agreement between the Customs and Border Enforcement and the Butterfly Association. Well, they clearly don't agree that this was within the scope of that license. That's why it's in their complaint. That's their allegation, Your Honor. Well, we take it as true at this stage. Okay, I'm just providing you some background to explain exactly what was going on here. The extent that this enforcement zone had been contemplated, there's been no bulldozers, there's been no enforcement zone that's been created. Do you want to go back for a minute? Your view is we don't have any jurisdiction to hear any of this anyway, right? Yes, Your Honor. Could you just explain to me – I'm looking at the statute. Yes. It says – I mean, it seems to me the constitutional claims aren't covered by the statute because they don't, quote, arise from any action taken or any decision made by the Secretary in connection with the waiver. The constitutional claims – that's not what their constitutional claims are. They don't have anything to do with the waiver. So why does this provision block their Fourth and Fifth Amendment claims? Right. So the text of Section 102, what it states is that it's arising from any decision – I just read it. I just read it. Right. Any decision made – Yeah. Right? Or any action undertaken by the Secretary. And it refers you back to – The waiver. That's on Section 1. The waiver provision. Right? Which talks about waiving compliance with environmental laws or any legal requirement, actually, for barriers and roads. And if you look at – and we talk about the structure of this statute – Section 102B – and this is – you've got to go up a little bit. It talks about barriers and roads and things that are authorized when – and this is under Section 102A. But under 102B, it says roads, lighting, cameras, sensors, barriers, fencing. It lists a whole bunch of things that fall under barriers and roads. And so what we argued – and this is absolutely correct – from the President's executive order to the memorandum that was issued by the Department to the Border Patrol, as well as the ultimate waiver that was issued, all of these cite to authority in the Immigration Reform and Responsibility Act. That is the authority by which these activities are occurring. So the fact that there are – that the Secretary contemplated putting in lighting and doing some of the things – excavation, fill, the roads – all of that was under the authority of this Immigration Reform Act. That's where this authority comes from. Okay? That is separate from Section 357, 1357. 1357 is a patrolling statute, but the authority by which the President and the Department and the Border Patrol is actually engaging in some of the activities that lead to the complaints and the constitutional violations that they've alleged, all of that is wrapped up in actions that were taken under the Immigration Reform and Responsibility Act. But the jurisdiction script talks about actions arising from the Secretary's waiver. And the Ninth Circuit has reasoned that if you're not challenging the waiver or things that flow from the waiver, but things, as in this case, that precede it, the arising from language would not – would seem to limit the scope of what's stripped not to include. So our argument is – and I take your point, Your Honor – the arising from – if any decision made is read narrowly to mean the decision to waive, you've still got to account for the fact that there's any action undertaken by the Secretary. And here, all of the actions undertaken by the Secretary, all of the actions undertaken by the government are related directly to the Immigration Reform. It's related directly to the waiver. It's the waiver. It says – it says – Right. Let me finish my question. It says, for any decision made by the Secretary pursuant to Section 102C1, that's the waiver section. Yes, Your Honor. And the waiver section talks about the expeditious construction of roads and barriers. And so when the Department issues a waiver – and in this case, I understand the timing of this. They filed their complaint, months went by and the Secretary issued the waiver. The reason why the Secretary issued the waiver when she did has nothing to do with litigation but has to do with the simple fact of when contracting is available. The Secretary issues waivers right at the time that we're able to – that the government is able to proceed with contemplated projects. So, yes, all of the things that they've alleged, all of the activities that have been occurring on their property that are tied to their constitutional claims, they're all directly related to the authority under the Reform Act. There's a lot of case law in the Supreme Court in here which says that jurisdictional stripping statutes have to be read narrowly, especially when it comes to constitutional cases. And if Congress had meant this to say what you said, you think it does, it would have said – wouldn't have said arising from, it would have said in relation to. Your Honor, our argument is that all of the actions are arising from actions undertaken by the Secretary in this case. If the court concludes that that's not the case and you do find that you have jurisdiction to consider the merits of the dismissal of the Fourth Amendment and the Fifth Amendment claims, we have presented arguments that I believe are correct that the Fourth Amendment claim and the Fifth Amendment claim, the district court properly dismissed those claims. So can you explain to me for a minute why they didn't state a Fifth Amendment due process claim here? I mean, they own the center. They allege that the Border Patrol deprived it of the possessory interest in it without any procedures. Why isn't that a due process claim? They had knowledge, Your Honor, and this is where we get back to the patrol statute. Even before any of these activities occurred, the Border Patrol has been patrolling the border in this area for a very long time. They and their complaint recognize that the Border Patrol has the authority under Section 1358 to enter their property. It's allowed to enter a property within 25 miles of the border without a warrant. They had notice of that. They are well aware of the fact that the Border Patrol has entered their property. They need to allege, and this is the case law that we've talked about in our brief, they need to allege what process they are due. And if they have knowledge of a statute that provides the government with authority, they allege that it was unlawful. There's nothing unlawful about the patrol activities that have been occurring actually for decades. So what's your position on what the Patrol Act authorizes relative to the various facts that they've either alleged in their complaints or in declarations? Because I do think there's a bit of a disagreement about that. Right, so the regulation talks about customary, reasonable, and necessary activities. We've cited a couple cases to suggest that if held, the Border Patrol has installed sensors on the border. That is customary, reasonable, and necessary activities involved with preventing illegal crossings. The sensors in this case are not permanent. These are not permanent installations. The Border Patrol puts sensors in places and they remove those sensors or they put them in other places. They're not permanently located there. The enforcement of the border, this is well recognized that under the Fourth Amendment, the balance of the reasonableness tips sharply in favor of the government. The government has an interest. Is it typical in patrolling to have, for example, patrol people's cars parked across a private road on private property? Is it typical of patrolling to put CBP locks instead of the private party's locks? I mean, it might be to get access. Yeah, and I think in this case actually as to the locks, my understanding of what occurred is there were locks that had changed. The Border Patrol entered the property and cut locks because it needed to get onto the property. It put on its own locks and the next day gave the keys to the Butterfly Association. So you're not saying that... I do think it would be reasonable to suggest that under patrolling, you need to have access to the property. If access requires cutting locks, then yes. What about parking trucks across? I assume that's not something that you would defend as necessary patrolling. Parking trucks absolutely. Across so that they can't actually use them. I don't know the context by which, I assume it's for their own protection. I don't know if there's active... All I'm responding to is photographs in the record of three trucks parked across where nobody could then ingress or egress. I don't know exactly how the Border Patrol goes about detaining illegal crossings. I assume they have an interest in protecting the civilian population as well as those that may want to access the Butterfly Association. And not providing access while detaining illegal immigrants might well be a perfectly reasonable thing to be doing. Has the Border Patrol, for all these past decades under 1357, installed sensors on private land? The Border Patrol, since at least the 50s and 60s, has installed sensors on... On private land. I'm not aware of that answer, Your Honor. No, that's the question, right? What is the ordinary border patrolling of the border within the meaning of particular statutory provision addressing incursions onto private land? So that's what I'm trying to understand. That's new? No, it's not new at all, Your Honor. Sensors on private land is not new. I'm aware of litigation in other circuits by which people have brought claims against the government for the installation of sensors. I'm sorry, I just want to be clear. Is that a recent litigation? I think it's been in the case. I'd have to go look it up. Is this part of your decades of experience is what I'm trying to understand. The government has had to deal with sensors in other contexts on other properties. In other private properties. To my knowledge, yes, Your Honor, but I am not aware of... I can't provide you with a specific instance here. I have a couple of questions. On the... There's a provision in IRO 102B2 that provides for a process for obtaining easements on private land. Is that the kind of thing that's used for something like sensor placement or the ability, for example, to widen a road and make sure that it's passable or things like that? Right. So there's the... You're thinking about the condemnation procedures by which you might go about... The Attorney General can negotiate with a landowner and may go about trying to figure out how you'd acquire something like an easement. That has not occurred in this case. The Border Collie Association has cited those provisions in its complaint in the context of its Fifth Amendment due process allegations. That's what it cited for process. I'm just trying to understand because, you know, you from the government can inform us on how this is sort of used in practice and whether that's... What are the kinds of access rights that is... That you all think that's meant for? I would assume that if the government were interested in perhaps a permanent easement, then that might be something that they would be able to seek under those provisions, but that has not occurred here. Let me ask about the Fourth Amendment claim. If the government had wanted to, let's say, exercise forfeiture authority over the Butterfly Farm as the property in James Daniel Goode, would that, under your textual reading of the Fourth Amendment, would that not be covered because it's not a private home? Does it contain a private home? Right. And again, this is to your point, Your Honor. I think this was raised earlier, maybe Judge Millett, but you were asking about what's the difference between a Fourth Amendment claim and a Fifth Amendment claim, and traditionally when we're talking about the seizure, which is the James, which in that case actually did fall under the Fifth Amendment. So, yes, the Supreme Court talks a bit about the forfeiture under the Fourth. I know, I understand, but certain times you can have situations where perhaps you may see some overlap, but the court ultimately in that case, and the Butterfly Association acknowledges, that was ultimately a Fifth Amendment case. So if you do have a situation where you've got a complete deprivation of property, then you might have a Fifth Amendment takings claim or some sort of other Fifth Amendment claim that you might be able to bring. They've never sought that in this case. In their reply, they've made clear, we are not seeking a taking. So to the extent that they believe that we've interfered with their property or that we've somehow deprived them of their property rights, naturally you would think that they'd be bringing a takings claim, which they have not. Well, they're arguing process. Right. So they're saying it's not about condemnation, it's about whether you've done any process before you attach and cut and intrude and those kinds of things. But the reason I was asking about the forfeiture is, and I think it may be that this isn't that vividly presented in this case because they're not claiming, for example, that they didn't either enact a pursuant to a warrant or there wasn't kind of that kind of process and it's not been used or forfeited as evidence of a crime. And so maybe that, you know, I'm just thinking about how we would reason over this without eliminating some very important avenue that might be useful in a different case. I mean, I take your point. I understand it might seem harsh to call a butterfly botanical garden an open field that does not... Well, I'm just questioning, probing how much the open field doctrine applies, not in the search context, but in the seizure. Right. So let's back up one second there. I think we made this point. They are conflating the nature of their property with the doctrine itself. So yes, there is an open field doctrine and there's plenty of case law on what is considered an open field doctrine. And I will admit that plenty of cases have talked about that as a search doctrine. I think my argument is more of a contextual nature and one that adheres to the Supreme Court's precedent in describing the nature of the property and the property interest that the Fourth Amendment protects. So that goes into the whole line of pieces that is like how those papers affect. Open field, you're not one of those things. This goes back to Blackstone. You fall outside the curtilage, you're in an open field. So that line of cases is different from the open field doctrine, which I can see has been primarily in search. But it also hasn't really been probed in the context of real property. And there are things like cars that don't go back to Blackstone. Right, but even the cases that they talk about, I mean, the Pressley and the Severance case, I mean, the Fourth Circuit recognized that the protections of the Fourth Amendment may not extend beyond the curtilage. And they specifically say that in their case. So, you know, the cases that they're relying on is the show. Could you set up video cameras? Could you set up video cameras across the... Yes, I believe that one of the things that were listed was lighting. So your theory is the open field doctrine, which arose in a context of generally entries and just keeps on going even as technology evolves. And so the government could set up all kinds of recording devices in my backyard, which is outside my curtilage, and leave them there. As long as you move them around so it's not a permanent take. I think your backyard is quite different from a botanical garden on the international border of the United States. It's not my curtilage. It's not my curtilage. It may well be, Your Honor, and that's the point. And so in the Severance case, the Pressley case... I've got a good-sized backyard. I'm not aware of what kind of size your backyard is, but, I mean, if it's a 100-acre botanical garden on the border of... No, you just argued curtilage and house. Yes. And so I don't know how far out you think curtilage goes, but assume we are a foot outside the curtilage. Is your view that the open field doctrine, as so far explicated by Supreme Court in older cases that weren't dealing with technology, doesn't factor in at all the nature of the governmental intrusion on private property? My view, Your Honor, has been articulated by Oliver, Hester, Jones, Dunn. These are several cases the Supreme Court has, in fact, held that the Fourth Amendment does not protect open field. But the nature, and maybe the issue here is they're arguing seizure, not search. That may be the answer here. But, to be clear, the President, for a very long time, said that people don't have any private interest in their movement on public roads. But then when technology was used through GPS monitoring in the Jones case to collect way more information about people, the Supreme Court said, hang on, that's different. And so the question is, is what's being done here different than what prior open field cases recognize? I mean, it's more a search problem than a seizure one. We haven't even talked about privacy. So there's a property approach and there's a privacy approach. Your Honor, is that correct? The Jones, these are different things. And they've cited cases where open fields were turned up, they were dug up. Those are privacy interests, hotel rooms, telephone booths. And then, at the same time, they're saying, well, no, privacy plays no role here. But those are privacy. I view it as two separate things. There's the property line of cases and there's the privacy line of cases. And when we're in the cat's world, it is a different world, Your Honor, and absolutely. It's all about reasonableness. And so, and legitimate expectations of privacy. And our argument, we made two arguments in our brief. One is explaining the property-based approach and the other is explaining the privacy-based approach. So under the privacy-based approach, you might well have the situation where, and they've cited a case from, I think it's the Fifth Circuit, where they were turning up the earth, right? Well, yes, you may in fact have a privacy interest in the ground underneath your open field. That's totally different than what's going on here. And they've never alleged anything near the sort of that. And those activities have not occurred on their property. There's been no, none of those things are occurring in this case. So, you know, they've actually fought us on privacy and I take their point and we agree. Their privacy interests have not been impacted here. And so the reasonableness of government intrusion, and this is important, whether you call this a search, whether you call this a seizure, this is the border. This is the border of, the international border with Mexico. There's a number of cases that we've cited from the Supreme Court and other circuits recognizing the sovereign interest of the United States to protect its border from illegal crossings. And so to the extent that some of these intrusions have occurred, they've occurred under statutory authority and they were reasonable under the Fourth Amendment. Well, last question. I just want to be sure. Government's position is that the appropriations rider moots beneath the endangered species, all construction related claims, right? We agree with the assessment that they've put forth, which is there are no current activities contemplated. The government is not doing anything right now on their property and there are no clear plans. That's a little clever the way that you quoted them in the brief. I mean, they are claiming that there are a lot of current intrusions and unremitted intrusions. Yes, and so I want to unpack this a little bit. The appropriations rider talks about pedestrian fencing. The language of the statute says that no funds shall be used to construct pedestrian fencing. It lists five specific locations, one of which is the Butterfly Center. So there will be no pedestrian fencing constructed on their property. What does pedestrian fencing mean? I believe it means what it says. I don't know what it means. It's a sort of fence that prevents people from entering. Okay, so that would not include installation of sensors? So that's the question, Your Honor, and I think that as of right now, as of right now, under the authority, under the waiver that was issued by the Secretary, the government is not doing any activities associated with the waiver's legal requirements, the installation of some of the things that it talks about. We can talk about it in the context of the 1350. That's a difference. So these are two separate authorities, and I want to be clear on this. The 1358 authority is the patrol authority. That's customary and reasonable. So we talked about that in the context of the Fourth Amendment. That also provides authority for the government to do things like patrol the border, enter their property within 25 miles of the border, and it may well include the installation of sensors that are not permanent that are taken up. So that's a separate authority. Right. I just want to focus on the Appropriations Act because it draws a distinction between the funds appropriated for pedestrian fencing and the funds appropriated for border security technologies. Yes. And to the extent that their claims involve, are you willing to state the position of the United States that none of the intrusions identified either in their complaint or the declarations fall under the category of border security technologies? It's all pedestrian fencing? I'm not sure that I can agree with that, Your Honor. Right. That's what I assumed would be your position. I don't know how you can argue it moots their claims. Because I looked at their complaint, and their complaint talks about border wall construction. Their complaint talks about preparation activities associated with the construction of the border wall. It talks about widening roads. It talks about sensors. It talks about locking gates. You need to have an imminent threat of injury here, and on this record, given their view of this Appropriations Act, what they are saying, it has mooted their claim. But that, Mr. Buehler, doesn't make sense. So you've done this in your brief on page 30, on page 31, on page 51, and you say, in fact, it's clear the claim is not right because Congress enacted the Appropriations Act, which the association views as a complete prohibition of construction of a wall. And they view that as a prohibition. But they think that you're violating it because you, as you're demonstrating, by the way, you're answering questions here today, you view it as placing a much narrower prohibition, perhaps with legal support, as Judge Millett is pointing out, because it's only prohibiting construction, not border security activities. So to the extent border security activities are still CBP's prerogatives, then there's an issue joined about whether they're patrol activities or whether, in fact, there needs to be some kind of easement or some kind of pre-entry process in order to effectuate them. I think that's fair, and tell me why you don't. I'm just sticking to the language of the statute, Your Honor, and I don't mean to try to dodge the question. The language of the statute says pedestrian fencing, you're right, Judge Millett, it talks about technologies, and that has not been prohibited under the language of that statute. So we would have to resolve that statutory question before we can determine whether the case is moot. Well, I think you need to resolve under Article 3 whether they have alleged and are alleging an imminent threat of injury. And our argument in our brief is, given their views and the claims that they've asserted, the complaints, the allegations that they've brought forth, they have mooted, the Appropriations Act, in essence, has mooted those claims. Are you aware of any case where we have found mootness based on the argument you're doing here where someone says, here's what we think a statute means, and if we win we're taken care of, and the government comes in and says, we are not agreeing with your interpretation of the statute. We are not agreeing with your interpretation of the statute, but nevertheless you should declare it moot without resolving that statutory construction question? I've never seen a case like that. No, I mean, I'm relying on Clapper. I mean, Clapper tells you, Your Honor, that you have to have an immediate injury. They sought an injunction. That's the relief they sought. They sought an injunction from the district court that would prevent the construction of border wall. And they view the Appropriations Act... I'm sorry. No, so they have... That's the question of what you mean by construction of border wall. They want... They've got concerns about more than just... If the border wall is pedestrian fencing, and all of these things are vague terms, that's one thing, but if what is meant by the border wall could be fences, could be barriers, could be other forms of border security technologies, then it's not moot. Okay. I'm going off of their allegation. When you read their complaint, Your Honor, these are not the kinds of concerns that they've raised. Well, it's not just the... Well, they do raise these other things. You came forward with a jurisdictional argument to us about mootness. The government did. Yes. And it just struck me, at least. I can only speak for myself, quite odd to see the government come in and make an argument that it's moot, not based on a complaint, but if they're right on the law, it's moot. But we're not saying they're right on the law. That's how I understood your mootness argument. I think we might be talking past one another here, Your Honor, and I apologize for that. It was more in the context that they lacked standing to get the injunction that they sought. So Summers tells you that you can't get an injunction, so that if you read, and maybe I should have been more clear on this, the mootness argument is due to standing, to the relief that they're seeking. The relief that they're seeking is an injunction preventing a border fencing wall, whatever you want to call it. They cannot receive that relief because it's no longer available to them. It's done. It's been mooted. The appropriations bill, there's no construction that's going to occur on their property. They say that. We are not doing anything. There's no imminence of harm. There's no, Clapper tells you that they have, the only way they can get this injunction to prevent the government from going forward with these things is if they have. But if you assert the authority and you're just not doing it now, you stop for a little while. That's just capable of repetition. Or it's voluntary cessation. These are arguments that they may have raised in their reply brief and they chose not to, Your Honor. Well, do you think it's moot then or not, given the existence of those hearings? Your Honor, I think there is no imminent injury here. Is there any risk that whatever the current temporary cessation of activities is that they will, are you telling me that there is no reasonable risk that those will recur in the future? The Butterfly Association yourself stood here and said that it can predict. I'm asking you what the government's position is about it. I have no way of knowing what Congress will appropriate for funding. You're talking about appropriations. I'm talking about whether, if you have seized things that in your mind, in the government's mind, which I mean personally. Yeah, no, either way, I mean. Border security technologies. There seems to be unresolved issues and important ones. If there are border security technologies measures that the government would argue don't fall within the appropriations limitation, but they may be stopped right now for all kinds of reasons, but if the government is not representing that it has no intention of resuming any of these activities, whether called border security technologies or pedestrian fencing in the foreseeable future, then that's a different, that's an important statement by the government that would weigh into a movements analysis. But I hadn't heard you making that representation. All I can say is we're not doing anything right now under that authority, Your Honor. But you can't say whether it will change? That's accurate. I cannot predict the future, and that's the point. That's the whole point of Clapper. It's too speculative. It is too speculative to establish standing to support an injunction preventing the government from proceeding. That's what Clapper tells you, Your Honor. Anything else? We ask that you dismiss for lack of jurisdiction. To the extent that you do reach the merits of the claims, we ask that you affirm the judge's favor. Thank you. Federal police. So, Mr. Beacon, you are out of time. You can take three minutes. Thank you, Your Honor. Why don't you just start with this question right now? The appropriations bill, the rider. What's your reaction to what you just heard? It confirms that we don't know what's going to happen. The government hasn't been transparent. If they said, no, we interpret the rider on the appropriations bill as precluding us from building any infrastructure on your property right now, that would put us into a situation where we don't. I understand the government's position. It is that they look at your complaint or your brief and they say, you say that in acting the rider, it intended to protect the modified center from all forms of new construction, including walls, barriers, roads, enforcement zones, and artificial light. That's what they say you say it is. So, the government says, well, you know, if that's what the plaintiffs themselves say it does, and it's moved under the appropriations bill. That's their position. I think it's a little bit tough because they haven't taken a position about what they interpret the statute to be. All they're saying is, well, plaintiffs say, but I think that they need to take a stand. Paragraph 8 of your complaint, the claim for relief, asks for a broader injunction against conducting any further activities at the Butterfly Center, not just wall building. Yes, Your Honor. And that goes back to the part of our complaint that's about activities that were occurring and had occurred prior to us filing suit. And as to those activities, the relief you seek is declaratory relief. And as to prospective or current intrusions, you seek process in addition to the substantive due process claim. But just looking at the procedural due process claim, where they've already done things that are completely... We sought a declaration that... And where there are things ongoing, intrusions ongoing... Yes, Your Honor. You seek process and future... Well, we seek injunction. The injunction is under the due process claim. The injunction is, A, anything that you could legitimately do that you have authority to do, we need process for that. And B, for the things that violate substantive due process, you have to stop. And the things that are currently ongoing include... Continuing to be on the property, doing things that are apparently not patrolling and... Be more specific about that. What are they doing on the property now? Yesterday, there were two agents on the property. They were sitting in a car. We don't know... No, I'm sorry. They were not agents. There were two individuals in plain clothes sitting in a car. We didn't know what they were doing, but they're on Butterfly property. They're just sitting there. Butterfly Center called the police. The police caught up with these people. And it turns out these people are contractors of the government sitting on NADA's property doing we don't know what. But we don't think they're patrolling because we think that's the Border Patrol's job. And that is just one instance. We continue to have instances of NADA staff and guests being told they can't access parts of the property. What is the procedural due process you want for something like that? Your Honor, if I may, I think... Let me answer your question in two ways. First of all, we think that the procedural due process is they should reach out to us to seek our consent. And if they can't get our consent, then we need notice and an opportunity to be heard. 1103B, is that the process you're speaking of? I beg your pardon? The 1103B process under 8 U.S.C. 1103B, which directs the Attorney General to negotiate with landowners before initiating any condemnation, or is that... But that's the condemnation. No, no, no. I'm sorry, Your Honor. We're talking about them coming onto the land and asserting control that is above and beyond the patrol power. I'm not sure sitting in a car is above and beyond patrol power. I beg your pardon? I'm not sure sitting in a car is above and beyond the patrol power. By people who are not border patrol? I'm sorry. As to the patrolling activity, you say this has been going on for decades. Have you been getting... In the past, have you always had notice when they're coming onto patrol? Or is it just because it's contractors? No. In the past, we have not had notice when they come onto patrol. Not always. Well, sometimes they've come onto the property because the Butterfly Center has called them and said, we think that there's an illegal border crossing happening, and the Border Patrol has come on in those circumstances. But no, they have not always given us notice when they come onto patrol. But your position is that these people are likely construction contractors, not border patrolling contractors. That's what the police told us when they came back. Are your roads not open to the public? I beg your pardon? I thought your roads were sort of open to the public. Our roads are open to visitors to the Butterfly Center. I mean, that's different from... We have roads across that are, you know, we let people drive on for any reason at all. They're two different things. There are roads that are publicly accessible because it's a public... The Butterfly Center is for the public to come visit. Maybe the contractors wanted to look at the butterflies. I beg your pardon? Maybe the contractors wanted to look at the butterflies. They didn't come to... Stop it. They didn't come through the Butterfly Center. I mean, there's a, you know, there's an entrance fee. They don't pay it. Anything else? Your Honor, I know my light is out. Just make one point. That's it. Go ahead. I think the Donovan case, Your Honor, that we cited in our brief shows that the Supreme Court is gone beyond its concern for the four categories. Kat says they're not a talismanic answer to every Fourth Amendment question. Donovan, it's an agency that has the power to inspect surface mines and quarries. They're open. They're right on the surface of the ground. And the court finds that that inspection is reasonable under the Fourth Amendment. It doesn't find the Fourth Amendment doesn't apply. It finds that it does apply and that it's reasonable. And there's no way to reconcile Donovan with the four categories except to say, you know, that level of interest rises to the same level as the others. If you do the same thing with possessory interests, fee simple absolute, that is as strong a possessory interest as our society knows. And so it simply doesn't make sense to say that real property is not covered and the courts have not taken notice. Thank you. Thank you, Your Honor. Case is submitted.
judges: Tatel, Millett, Pillard